## Gingold v. Audi-NSU-Auto Union Ag.

*Larry E. Coben,* for plaintiff.
*Edward W. Maderira,* for defendant.

GAFNI, *J.,* May 12, 1988—This is a motion for partial summary judgment based on federal pre-emption as required by the Federal National Traffic and Motor Vehicle Safety Act, 15 U.S.C. §§1381-1431 (1982). The case involves a conflict between plaintiff's allegations that the 1983 Audi operated by the deceased, Gingold, was defective and negligently designed in that "passive restraints," such as "airbags, passive seat belts, knee bolster restraints, etc.," were not installed, and the applicable Federal Motor Vehicle Safety Standard (FMVSS) 208, 49 C.F.R. §571.208 (1982), which allows automobile

manufacturers a choice of three options, only two of which utilize passive restraints. FMVSS 208 is the Secretary of Transportation's response to the act's mandate to promulgate standards of nationwide applicability.

In ruling on this motion for partial summary judgment, the court has accepted the following allegations of plaintiff.

On February 10, 1984, at 6:30 a.m., Richard Gingold, age 36, was seated in the driver's seat of a 1983 Audi 5000 S automobile, waiting for the red light on Roosevelt Boulevard to change to green. At that time, defendant, James McCloskey, was driving his 1973 Cadillac in the same direction. McCloskey failed to observe Gingold's car or the red light and rear-ended the Audi at approximately 50 miles an hour. The rear end of the Audi was crushed forward on impact and the two cars stayed together travelling a distance of 44 feet. The Audi then separated from the Cadillac and continued to go forward until the car's front end hit a tree at about 25 miles per hour.

The first officer on the scene noted that Gingold was wearing a seatbelt over his suit jacket and overcoat. Although rushed to the nearest hospital, Gingold was pronounced dead on arrival.

A postmortem examination revealed that Gingold suffered severe facial injuries, brain damage, and injuries to the spinal cord. The examining physician allegedly stated that Gingold's fatal injuries were attributable to the frontal collision which caused Gingold to be thrown forward into the steering wheel and not due to the rear-end collision. It is undisputed that at the time of the accident, the deceased was wearing a manual three-point seat belt which complied with the act and other applicable

FMVSS, including FMVSS 208 governing occupant restraint systems.

Gingold, in her complaint, alleges that the defendants (Audi) were primarily negligent in designing the automobile, and the car was sold in breach of warranty.

Audi filed a motion for partial summary judgment on the passive restraints claim invoking the doctrine of federal preemption in the areas of the following allegations of negligence:

"12(b) Designing, manufacturing, fabricating and/or assembling the Audi without an effective and safe passive-restraint system, including but not limited to airbags, passive seat belts, knee bolster restraints, etc.;

"12(c) Failing to keep abreast of and take into account the state of the art of the science and engineering of passive restraint systems, including but not limited to airbags, passive seatbelts, knee bolster restraints, etc.;

"12(d) Designing, manufacturing, selling and/or supplying the Audi without incorporating therein the state of the art in the science and engineering of passive restraint systems, including, but not limited to airbags, passive restraints, etc.;

"12(l) Deliberately and intentionally excluding certain passive restraint systems even though the systems were necessary for the manufacture of a safe vehicle;

"12(m) Failing to make necessary modifications to the Audi when they knew or should have known that the dangerous condition of the automobile could be prevented by the incorporation of certain safety devices, including various passive restraint systems;

"12(n) Failing to include knee bolsters in the Audi;

"12(s) Failing to recall the decedent's vehicle and retrofit the vehicle with necessary restraint systems."

In general, the Audi defendants contend that Gingold's 5000 S complied with the federal safety standards concerning restraint systems. Audi argues that Gingold has made a "no-airbag" claim,[1] and that the federal safety standards pre-empt the field in this area of performance. Accordingly, it contends, a tort action which imposes a duty to install airbags may not be maintained. Audi argues that since it complied with federal standards, a court may not find that the Audi's restraint system was unreasonably dangerous.

A motion for summary judgment may be granted if there are no genuine issues as to material fact and the moving party is entitled to judgment as a matter of law. *McNair v. Weikers,* 300 Pa. Super. 379, 389, 446 A.2d 905, 910 (1982) (citing *LeGrand v. Lincoln Lines Inc.,* 253 Pa. Super. 19, 384 A.2d 955 (1978)). The moving party has the burden of showing that there is no genuine issue as to any material fact and must submit affidavits or other evidence in support of the motion. *Billman v. Pennsylvania Assigned Claims Plan,* 349 Pa. Super. 448, 453, 503 A.2d 932, 935 (1986); Pa. R.C.P. 1035. The trial court has the responsibility "to determine whether a genuine issue of material fact exists based upon an examination of the record in the light most favorable to the nonmoving party." Pa. R.C.P. 1035; *Johnson v. Baker,* 346 Pa. Super. 183, 185, 499 A.2d 372, 373 (1965).

This court, in viewing the matter in light of the foregoing standards, is persuaded that there are is-

---

1 A "no-airbag" claim alleges that the automobile is defective because the manufacturer did not install airbags.

sues of fact material to this cause of action which must be heard. As a result, partial summary judgment is denied.

In making its decision, this court has turned to legislative history and pertinent case law. At the outset, it is important to note that the tension between two different sections of the act is the major source of disagreement in decisional law whether to grant summary judgment on the issue of federal pre-emption: (1) §1392(d) which prohibits states from imposing safety standards which are not identical to federal standards; and (2) §1397(c), the savings clause, which provides that "compliance with any federal motor vehicle safety standard under this subchapter does not exempt any person from any liability under common law." To reconcile these two sections, it is necessary to review both the act's legislative history to discern the congressional intent as codified, and subsequent decisional law.

In considering Audi's motion for partial summary judgment, this court finds that the question of federal pre-emption under the act divides itself into two parts corresponding to sections 1392(d) and 1397(c) discussed above:

(1) Does the Federal National Traffic and Motor Vehicle Safety Act pre-empt a state common law tort action against an automobile manufacturer for failure to install airbags?

(2) Is plaintiff's allegation that the Audi 5000 was defective in design, manufacture, fabrication and/or assembly effectively a "no-air-bag" claim and subject to federal pre-emption?

DOES THE FEDERAL NATIONAL TRAFFIC AND MOTOR VEHICLE SAFETY ACT PRE-EMPT A STATE COMMON LAW TORT ACTION AGAINST AN AUTOMOBILE

## MANUFACTURER FOR FAILURE TO INSTALL AIRBAGS?

The express purpose of the act is to "reduce traffic accidents and deaths and injuries to persons resulting from accidents." 15 U.S.C. §1381. The Secretary of Transportation delegated to the administrator of the National Highway Transportation Safety Administration the duty to promulgate safety standards (FMVSS) for the explicit purpose of "enabl[ing] the federal government to compel automobile manufacturers to develop and apply new technology to the task of improving the safety design of automobiles as readily as possible." *Chrysler Corp. v. Dept. of Transportation,* 472 F.2d 659, 671 (6th Cir. 1972); 42 Fed. Reg. 34,293 (July 5, 1977). These goals and purposes are aptly expressed in S. Rep. no. 1301, 89th Cong., 2d Sess., reprinted in 1966 U.S. Code Cong. and Admin. News, 2709, 2710 (S. Rep. no. 1301):

"The centralized, mass production, high volume character of the motor vehicle manufacturing industry in the United States requires that motor vehicle safety standards be not only strong and adequately enforced, but that they be *uniform* throughout the country. At the same time, the committee believes that the state should be free to adopt standards *identical* to the federal standards." (emphasis supplied) *Id.* at 2710.

The act requires the administrator to establish "motor vehicle safety standards" 15 U.S.C. §1392(a), and defined a motor vehicle safety standard as "[a] minimum standard for motor vehicle performance, or motor vehicle equipment performance. . . ." 15 U.S.C. §1392(2).

This section of the act raises the question whether a state may enact a higher standard of care than the minimum set forth in the particular FMVSS and

not be in violation of the act. It has been suggested that while the act mandates a minimum standard, i.e., manufacturers may exceed it, it is meant to be a *uniform* national standard in that no state may enforce an identical or a higher safety standard applicable to the same aspect of performance. Wilton, *Federation Issues and "No Airbag" Court Claims: Preemption and Reciprocal Comity,* 69 Notre Dame L.R. 1, 33 (1986) (Wilton). In sum, if a state requires a higher standard regulating the same performance standard as a particular FMVSS, that state's requirement is pre-empted.[2] A brief history of FMVSS 208 clarifies this theory.

FMVSS 208, enacted in 1967, was the first safety standard promulgated under the act. It went through several amendments. In 1971 it required either seat belts or passive restraints. 49 C.F.R. §571.21, FMVSS 208 (1971). After the public outcry against a subsequent amendment providing for an "ignition interlock" system to "prevent starting the vehicle if the belts were not connected[,]" *Motor Vehicle Mfrs. Assn. v. State Farm Mutual Auto Ins. Co.,* 463 U.S. 29, 35-36 (1983), Congress again amended the act by adding 15 U.S.C. §1410(b) (1982) which prevents issuing any standard denying manufacturers the option of installing either seat belts or passive restraints unless Congress approves. This section provides in part:

"(2) Except as otherwise provided in paragraph (3), no federal motor vehicle safety standard respecting occupant restraint system may—

"(a) *have the effect of requiring,* or

"(b) provide that a manufacturer is permitted to comply with such standard by means of, an *occupant restraint system other than a belt system.*

---

2 Pennsylvania law provides that FMVSS 208 supersedes state law as to the same aspect of performance. 75 Pa. C.S. §4103(b).

"(3) (a) Paragraph (2) shall not apply to a federal motor vehicle safety standard which provides that a manufacturer is *permitted* to comply with such standard by equipping motor vehicles manufactured by him with *either*—

"(i) a belt system, *or*

"(ii) any other occupant restraint system specified in such standard." 15 U.S.C. §1410(b) (1982). (emphasis supplied)

The actual safety standard contained in FMVSS 208 has not changed significantly since the early 1970's. The provisions of FMVSS 208 applicable to 1983 model year cars give manufacturers three options for complying with the safety standards for restraint systems. *First,* manufacturers may provide passive restraints, such as airbags, for the frontal outside seats in conjunction with the seatbelts for the front, center, and rear seats. 49 C.F.R. §571.208 S4.1.2.1. (1987). *Second,* manufacturers may utilize a combination of passive restraints, detachable shoulder harnesses, lap belts, and warning systems. 49 C.F.R. §571.208 S4.1.2.2. (1987). *Third,* manufacturers may provide a combination of lap belts, non-detachable shoulder harnesses and warning systems. 49 C.F.R. §571.208 S.4.1.2.3. (1987). Simplified, with respect to airbags, the first option requires full airbag protection, the second option requires only frontal airbag protection, and the third option requires only a lapbelt and shoulder belt apparatus.

Interestingly, the legislative history of FMVSS 208 reveals that at the time the decedent's Audi was manufactured, there was much controversy whether the state of the art in passive restraint systems was sufficiently refined to make them safer than manual three-point seat belts. In 1977, an amend-

ment to FMVSS 208 rescinded a proposed passive restraint requirement. Secretary of Transportation William Coleman reasoned that passive restraints, although "technologically feasible" and eventually cost effective, provided no materially greater protection than seat belts when used properly. The only reason, however, that the cause of safety would not be served by mandatory passive restraint at that time, he determined, was because the public most probably would reject passive restraints and this could be a severe setback for an automobile safety program. D.O.T., *The Secretary's Decision Concerning Motor Vehicle Occupant Crash Protection* 6, 10-13, 26, 32-34, 36-38 (December 6, 1976); 41 Fed. Reg. 24071 (June 14, 1976). In the same year, Coleman initiated a new rulemaking procedure on the issue. 41 Fed. Reg. at 24082. He proposed a major demonstration project, involving 500,000 cars to test further the safety features of passive restraint systems.

The next Secretary of Transportation, Brock Adams, discontinued the testing and modified the standard to phase in passive restraints by 1982. In 1981, the entire standard faced rescission due to the automobile industry's decision not to install automatic seatbelts in the majority of cars. *Motor Vehicle Mfrs. Assn. v. State Farm Mutual,* 463 U.S. 29, 38 (1983) (ordering a remand for further consideration holding that the agency's explanation for rescission of the passive restraint system was arbitrary and capricious).

At the present time, after extensive studies and analysis, formal interviews and almost 8,000 public comments, 49 Fed. Reg. 28,962, 28,964, 28,969-75, 28,984-86 (July 17, 1984), FMVSS 208 now requires a gradual installation of passive restraint systems over a three-year period which will be rescind-

ed if by 1989 a designated number of states enact laws requiring the use of manual three-point seat belts.

It is apparent that the congressional mandate of optional restraint systems in 15 U.S.C. §1410(b) and the legislative and regulatory history of FMVSS 208 expressly compel pre-emption when a state regulation requires airbags. Congressional intent was codified in 15 U.S.C. §1392(d), which provides:

"Whenever a federal motor vehicle safety standard established under this subsection is in effect, no state or political subdivision of a state shall have any authority either to establish, or continue in effect, with respect to any motor vehicle or item of motor vehicle equipment, any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the federal standard . . ."

This pre-emption clause is unusually strong because it declares its regulations to be totally pre-emptive in the performance area they govern. Wilton, 69 Notre Dame L. Rev. at 15. "States may enforce only 'identical' regulations under . . . §1392(d), not ones which are less or even more demanding. The choice of the word 'identical' rather than the word 'inconsistent' manifests an apparent intent to pre-empt all state regulations which do not mirror the precise requirements of federal regulation promulated under the act." *Id.* In summary, states may regulate only those aspects of performance not specifically established by the federal government. *Wood v. General Motors Corp.,* Civ. Act no. 84-1566-Y (D.Mass. May 8, 1987) interlocutory appeal pending, no. 87-1750 (1st Cir.); *Chrysler Corp. v. Rhodes,* 416 F.2d 319 (1st Cir. 1969).

The issue then is how one reconciles the savings

clause with this pre-emption mandate since 15 U.S.C. §1397(c) provides that "compliance with any federal [FMVSS] under this subchapter does not exempt any person from any liability under common law." In 1977, Congress stated:

"The states are also permitted to set more stringent requirements for purposes of their own procurement. Moreover, the federal minimum safety standards need not be interpreted as restricting state common law standards of care. Compliance with such standards would thus not necessarily shield any person from product liability at common law." S. Rep. no. 1301.

A majority of courts have read the savings clause narrowly, finding that it only allows state tort law remedies for matters not covered by the applicable federal regulation.[3]

The court, in *Cox v. Baltimore,* 646 F. Supp. 761 (D.Md. 1986), taking a narrow view of the safety clause, reasoned that the clear meaning of the clause provides that compliance with the federal standard does not protect an automobile manufacturer from liability for design or manufacturing defects, but does in connection with matters *not* covered by the federal standards. *Id.* at 764 (citing *Chicago and Northwestern Transportation v. Kalo Brick and Title Co.,* 450 U.S. 311 (1981)); *Wickerstrom v. Maplewood Toyota Inc.,* no. 470771 (Minn. Dist. Ct. Ramsey Co. November 26, 1986).

Similarly, *Mackey v. American Honda,* no. 83CV-08-4508 (Referee, Ohio C.P., Franklin Co. December 17, 1986), chose to harmonize the two statutes

---

3. The U.S Supreme Court in *San Diego Build. Trades Council v. Garmon,* 359 U.S. 236 (1959), recognized that an award of damages in a state common law action is itself a regulation and may not "regulate activities that are potentially subject to the exclusive federal regulatory scheme." *Id.* at 247.

by giving the savings clause a narrow interpretation,[4] stating:

"The only plausible interpretation of 15 U.S.C. §1397(c) that satisfies the requirement that statutory provisions be construed in a manner that harmonizes them and gives meaning to each is one that allows common law remedies in harmony with the purposes and policies of the NTMVSA, but also prohibits any common law remedy that would conflict with those federal policies and purposes. Only such an interpretation can properly advance the congressional policies of both §1392(d) and §1397(c).

"This specific prohibition set forth in 15 U.S.C. §1392(a) precludes the establishment, by any state, legislative or judicial body, of any state motor vehicle safety standard not 'identical to the federal standard.' Thus, any common safety feature specifically governed by an FMVSS that, if upheld, would establish a standard which conflicts, is barred. However, the savings clause provision in 15 U.S.C. §1397(c) preserves common law causes of action where plaintiff alleges: (1) a manufacturing defect; (2) a design defect of a component or device not specifically addressed by an FMVSS standard; or (3) a failure to comply with an FMVSS requirement. Such an interpretation harmonizes the policies underlying both sections and prevents a savings clause from undermining regulatory objections."[5] *Mackey v. American Honda, supra,* at 4.

---

4. The following courts have found express pre-emption, but without an opinion: *Soboscienski et al. v. Ford Motor Co.,* no. 2 NO-85-246 Civ. (Alaska Super. 2d Dist. October 28, 1986); *Phillips v. Namie,* no. 85-33951-CA-07 (Fla. Cir. Ct. Dade Co. Sept. 22, 1986).

5. Section (c) of the holding will be discussed in the next section of this opinion.

In reading the savings clause in harmony with the pre-emption clause, one is compelled to conclude that state tort actions may be pursued only with respect to standards not covered by federal regulations. The rest are pre-empted. *Silkwood v. Kerr-McGee,* 464 U.S. 238 (1984).

A minority of courts do not pre-empt common law actions for damages for failure to install airbags. The court in *Woods v. General Motors, supra* at 12, declared that a tort action is not pre-empted since the purpose of a common law tort action is to compensate and not to regulate. The court held that the federal standards were only minimum standards, and added, if Congress had wanted to expressly pre-empt airbags claims, it would have used clearer language in the pre-emption clause. *Id.* at 13. The courts in both *Morgan v. Nobel,* no. 84-C1-136 (Ky. Cir. Ct. Knott Co. February. 26, 1986), and *Lynch v. Mims and Ford Motor Co.,* no. 85-1901-CB (Fla. 10th Cir., August 20, 1985), also decided that the FMVSS intended to supplement, not eliminate, common law tort remedies.

While 15 U.S.C. §1401(b)-(d), *supra,* was enacted to subdue public outrage over ignition interlock systems and not to prohibit airbag systems, courts have found that §1410(b)-(d) *expressly* prohibits regulatory bodies from requiring airbags, because a state regulation in the same area of performance would directly conflict with FMVSS 208, e.g., *Mattelot v. Toyota,* no. CV-85-054-GF, (D.C. Mont. April 27, 1987).

Other courts, however, have used 15 U.S.C. §1401(b)-(d) to deny common law tort claims under the doctrine of *implied,* rather than *express,* pre-emption.

Courts have applied this doctrine under one of two theories:

(1) Compliance with both a state and a federal imposed standard might be impossible. Section 1401(b) prohibits the DOT from requiring any non-belt safety system unless the secretary first follows special hearing procedures and provides both Houses of Congress an opportunity to review the proposed regulation. Since FMVSS 208 offers the choice of three options to car manufacturers, the effect of a restrictive state regulation in the same area of performance could make compliance with the federal standard impossible. *Silkwood v. Kerr-McGee, supra; Baird v. General Motors Corp.,* 654 F. Supp. 28 (N.D. Ohio, 1986). In support of this analysis, *Baird* cites the following statement in the Federal Register:

"By issuing a performance standard rather than mandating the specific use of one device such as airbags or prohibiting the use of specific devices such as non-detachable belts, the department believes that it will provide sufficient latitude for industry to develop the most effective systems. The ability to offer alternative devices should enable the manufacturers to overcome any concerns about public acceptability by permitting such public choice . . . This approach also has the advantage of not discouraging the development of technologies.

By encouraging the use of such alternatives to automatic belts through this rule making, the department expects that more effective and less expensive technologies will be developed." *Baird,* at 32 (citing 49 Fed. Reg. 28,862, 28,997 (1984)).

(2) The act's purpose would be frustrated if state regulation is not pre-empted. Courts under this theory have balanced the need for uniformity in safety standards against the avowed primary purpose of reducing traffic accidents, deaths and injuries. In *Cox v. Baltimore, supra,* the court, holding the state ac-

tion implicitly pre-empted because it frustrated the act's goal of uniform standards, opined that §1410(b)-(d) is Congress' direct mandate that no passive restraint system be imposed without direct congressional approval. *Id.* at 764.

To discern congressional intent, courts must weigh the relative importance of the act's two purposes, safety and uniformity. Apart from uniformity, two of Congress' specific policy objectives would be defeated by a state tort standard: (1) the decision to allow options among passive and active restraints because of a continuing concern about the safety of airbags, and, (2) the hope that manufacturers would develop new and more effective restraint technologies in response to public feedback regarding the options actually chosen. *Cf.* Wilton, *supra*, at 27.

In addition, courts such as the the one in *Cox, supra*, stated that the goal of uniformity, although it is a subsidiary goal, would be frustrated totally by a state goal of airbags. *Id.* at 764 (citing S.Rep. no. 1301, *supra*). The court also noted that no such rule could be adopted without congressional approval without frustrating section 1410(b)-(d). *Id. Accord, Vasquez v. Ford Motor Co.*, Civ. no. 86-0657-PHX-WPC at 2 (D. Ariz. Nov. 18, 1986); *Hughes v. Ford Motor Co.*, no. H-84-1049 at 14 (D. Conn. July 17, 1986).

This court is persuaded that FMVSS 208 and 15 U.S.C. §§1410(b) and 1392(d) compel the conclusion that a "no-airbag" claim is federally pre-empted under the doctrine of implied pre-emption. A plaintiff is precluded from alleging that a vehicle is defective because no airbag system was installed. Recently NHTSA confirmed the options contained in FMVSS 208 even for post-1986 automobiles in its latest regulatory pronouncement:

"Standard no. 208 does not now require, nor has it ever required, manufacturers to install airbags in their cars. Instead, Standard no. 208 is a performance standard, and any restraint system that provides the specified performance may· be used to comply with the standard. Thus, if some or all of the vehicle manufacturers . . . [should] install automatic belts . . . [, t]hey would *simply be exercising an option they have always had for complying with Standard no. 208.*" 52 Fed. Reg. 42,440-45, (November 5, 1987). (emphasis supplied).

## IS PLAINTIFF'S ALLEGATION THAT THE AUDI 5000 WAS DEFECTIVE IN DESIGN, MANUFACTURE, FABRICATION AND/OR ASSEMBLY EFFECTIVELY A "NO-AIRBAG" CLAIM AND SUBJECT TO FEDERAL PRE-EMPTION?

This court considers next whether Gingold's claim that the Audi was not crashworthy and was defective in design "because it did not provide every element necessary to make it safe in forseeable collisons," is a common law claim which does not regulate the same aspect of performance as FMVSS 208.

Gingold asserts that, given that 15 U.S.C. 1397(c) expressly preserves common law liability,[6] "a common law claim predicated upon a crashworthiness

---

6. In *Dawson v. Chrysler*, 630 F.2d 950, 957-958 (3d Cir. 1980), in a strict liability case, found against Chrysler which argued that the design of a 1974 Dodge Monaco complied with all the standards authorized by Congress under the act. The court quoted 15 U.S.C. 1397(c) in making its decision. Our Superior Court in *Jackson v. Spagnola*, 349 Pa. Super. 471, 479, 503 A.2d 944, 948 (1986), also a products liability case, stated that compliance with an FMVSS under the act is only a guide and not conclusive and does not immunize a manufacturer from liability.

defect seeks to impose liability based upon the failure to install design features to mitigate injury." Gingold also asserts that the FMVSS regulatory scheme, "as *performance criteria* . . . do not tell the manufacturer how to design the vehicles." The assumption is, therefore, that manufacturers are liable for any design defects and a finding of liability for defective design is not a state regulation in the same area of performance as FMVSS 208.

In "a design defect case . . . , where the design is the result of a conscious choice, . . . the manufacturer is negligent if it designs a product that is unreasonably dangerous." Wilton, *supra* at 8. See W. Prosser, The Law of Torts 641, 644-45, 659. A court must consider, however, that "[w]hen the federal regulation is on point, applies to the subject vehicle, considers the same problem that a suit asks a jury to consider, and is up to date . . . , justice requires that the manufacturer be entitled to rely on the standards as establishing the duty of care.[7] This is particularly true when the regulation has approved specific alternative safety devices, and the plaintiff's claim is that the approved device chosen by the manufacturer is legally inadequate under the law of torts."[8] Wilton, *supra*, at 33.

---

7. The following citations represent the body of Wilton's footnote 176 at 33. Inter alia Johnson, *Products Liability "Reform": A Hazard to Consumers*, 56 N.C.L.Rev. 677, 688 (1978) ("If a court finds a governmental standard is rigorous, up-to-date and directly addresses the defect alleged, compliance with that standard should be dispositive of the manufacturer's due care."); . . . *Hurt v. General Motors Corp.*, 553 F.2d 1181, 1184 (8th Cir. 1977) (compliance with FMVSS governing seatbelt angle satisfied tort duty of care despite claim that seatbelt angle was defectively dangerous) . . .

8. The following citations represent the body of Witon's footnote 177 at 33. *Temple v. Wean United Ins.*, 50 Ohio St. 2d 317, 327, 364 N.E. 2d 267, 273 (1977) (where power press

It is far from clear what constitutes an acceptable common law claim under the act. As noted above, it is not enough to allege that defendant was liable for choosing a different even though equally effective device to protect against an identical danger, e.g., alleging that defendant should have installed airbags. The court in *Jones v. Toyota Motor Co.*, no. 85-27744-MA (W.D. Tenn. Dec. 11, 1986), found no pre-emption when plaintiff asserted that one of the automobile's instrumentalities, assembled as an integral part of the vehicle, enhanced the injury or that defendant omitted a safety device whose purpose was to alleviate a specific danger. In *Murphy v. Nissan Motor Corp.*, 650 F. Supp. 922 (E.D.N.Y. 1987), the court failed to find pre-emption when plaintiff alleged that the reclining seats made the regulation seatbelts ineffective and, therefore, the defect rendered the vehicle unreasonably dangerous. In both cases, plaintiffs refrained from alleging that one option under the act should have been chosen over another.

In this case Gingold asserts what appears to be a "no-airbag" claim, stating, "Plaintiff intends to prove that an airbag restraint system would have avoided this tragedy." Gingold, in her complaint, however, does not merely allege that the Audi was defective because it was not equipped with airbags. The gravamen of her argument is that Audi could have chosen an alternate restraint system which would have rendered the Audi 5000 S crashworthy,

---

manufacturer used one of ten safety devices approved by State Industrial Commission, court held this satisfied state tort duty of care as matter of law). But see *Roberts v. May*, 41 Colo. App. 82, 86, 58 3 P.2d 305, 308 (1978) (compliance with dashboard rigidity standard did not necessarily satisfy state tort duty of care).

but, instead, chose seatbelts which were inadequate to protect the driver of this particular car against "*avoidable* fatal injuries."

Both Gingold and her expert, Donald Friedman, in his deposition maintain that because "the seat belt is designed to allow slack in usage, and it does not safely tighten when you buckle up, and because the inertia reel will not tighten there is no protection during a rear end crash." Friedman also claims that because of the slack in the seat belt which allowed the decedent to move toward his own foot-well and fall across the passenger seat with his head in the passenger's foot-well, "the systems [the seat belt and the steering wheel pad] failed and were unreasonably dangerous and defective. . . ." This is true of *this* particular car, they assert. It might not be true of others, or even this car, had the car itself been designed differently, taking into account the nature of the seat belt system approved by the federal agency. In addition, Friedman testified, Audi failed to warn its customers "that any wearing of outer garments or slack or changed size of occupant makes the existing system relatively ineffective."

Otherwise stated, this court is fully aware that both parties agree that the seat belt system satisfied the minimum federal standards. There is sufficient material in Friedman's testimony relative to VW/Audi's previous testing of passive restraints, however, to make it questionable whether the system chosen was proper for the size and make of the car in issue and, therefore, constituted a design defect.

Friedman was involved in a vehicle testing program in the early 1970's until 1980, utilizing a knee bar or knee cushion which was developed by Audi and an air cushion restraint system. In 1977 he visited Mr. Ulrich Seiffert of VW/Audi in Germany and

became familiar with the occupancy safety tests that Audi was conducting. Audi had been testing four different restraint systems using approximately 150,000 vehicles from 1974 through 1978 and had made considerable headway in automotive safety research and occupant protection. The systems involved were: (1) a three-point harness with emergency locking retractor; (2) a three-point harness with emergency locking retractor plus a force limiter and preload device which would tighten the belt system on impact; (3) a two-point belt and knee bar; and (4) a two-point belt and knee bar with preloader and force limiter. He claims, however, that Audi was deficient in applying the results of these efforts to the Audi 5000 that he bought while in Germany and to Gingold's Audi which he examined later.

Friedman also showed a NHTSA film of a 1982 Audi 5000 involved in a frontal collision, but travelling ten miles an hour faster than Gingold's Audi upon impact. Friedman described the position of the body and the manner in which the seat belt harness failed to prevent the contact of the head with the steering wheel. He opines that the outer garments increased the slack of the seatbelt and, because the belt did not lock when the car accelerated, Gingold was thrust forward and fatally injured. In sum, several protective systems had been thoroughly tested by Audi and were readily available for Audi's use as early as 1977.

Gingold has predicated Audi's liability upon an alleged failure to manufacture a reasonably safe vehicle. Air bags are just one example of restraint systems which Gingold and Friedman allege could have made the Audi 5000 S crashworthy. It is possible that the restraint system chosen by Audi was not appropriate to the Audi 5000 S in issue. While it is true that the seat belt satisfied the federal safety

standard, it may not have been adjusted properly in relation to the other physical characteristics of the car. In addition, Friedman raises the issue of whether Audi has failed to warn customers that the belt reacts differently depending on the physical proportions and amount of clothing worn by the driver. These issues are still outstanding and need to be addressed.

This court is persuaded that Gingold's claim sufficiently suggests a manufacturer's defect, *Mackey, supra* at 4, that is worthy of further factual development at trial. As a result, partial summary judgment is denied to defendant Audi.